# Richmond.

## SCOTT'S EX'X v. ASHLIN & ALS.

### JANUARY 23d, 1890.

1. DECEDENT'S REALTY—*Application to debts—Heirs.*—There can be no resort to decedent's real estate to pay his debts until his personalty has been exhausted. When that has been exhausted, whether by *devastavit* or distribution, the real estate in the hands of his heirs may be subjected. Code 1873, ch. 127, sec. 3.

2. IDEM—*Creditors—Laches—Case at bar.*—The evidence in the case here discloses no *laches* on the part of the decedent's creditors to have their claims paid, and they are not barred of their statutory right to have his realty subjected to their payment.

3. DOWER—*Commutation—Re-estimate.*—Where in suit to which the creditors and the heirs were parties, widow agreed to sell her dower at a price approved by a decree of the court, a re-sale and re-estimate will not be decreed on the ground that the allowance was excessive, especially when the creditors do not complain.

Appeal from decree of circuit court of Albemarle county, rendered October 14, 1887, in the chancery causes of Scott against Langhorne and Scott against Ashlin's Administrator, &c., and other causes heard together. The decree being adverse to Z. R. Lewis and Nannie L. Lewis, his wife (who before her marriage was Nannie L. Scott), and others, they appealed. Opinion states the case.

*S. V. Southall, Moon & Dabney,* and *Camm Patteson,* for the appellants.

*W. B. Pettitt, A. A. Gray,* and *Geo. Perkins,* for the appellees.

LACY, J., delivered the opinion of the court.

This case is as follows: On the 4th day of March, 1865, Charles A. Scott died intestate, leaving surviving him his widow, Pocahontas B. Scott, and four infant children, Elizabeth R., Fannie B., Mary B., and Nannie L. Scott, the eldest eight years of age. He owned at the time of his death a valuable and productive farm of some 1,740 acres, situated in the county of Albemarle, called "Scotland," stocked with a large amount of personal property. His debts were small, except two, which he owed as security for his brother, John L. Scott. These were contracted in 1854, for $5,000, to Samuel Stillman and R. W. Ashlin, and in 1885, for $1,000, to R. W. Ashlin, surviving partner of Stillman & Ashlin, upon both of which a large amount of interest had been paid. Just at the time of his death his dwelling-house, and all, or nearly all, of his furniture, and his family's clothing, and other supplies, were destroyed by fire, applied by Sheridan's raiders; and in a month thereafter the war ended, annihilating all the currency of the country, freeing its slaves, (in the language of the learned counsel,) plunging his inexperienced widow and tender young children, all girls, into a sea of troubles, without a house to live in, without a bed to sleep on, without clothing to wear, without money to pay for wearing apparel, without slaves to work the farm, and all society in an abnormal state of almost chaotic disorganization and disruption. All necessaries, especially such as the mother and her children stood in dire need of, were scarce and high, and could be had, if at all, only for ready money. Under these circumstances the widow supplied the pressing needs and necessary wants, according to her estimates, of herself and her children, by the sale as occasion required or suggested, of the produce then upon the farm, especially the tobacco on hand. With the money thus obtained, she supported her children and herself, and cultivated the farm, as best she could under the new and changed condi-

tions around her. In October following, she qualified as administratrix of her husband's estate, and in the following month she qualified as the guardian of her infant children. On the 8th of November, 1865, a sale was made of the personal effects, which amounted to $7,917 16.

At the March rules, 1867, Mrs. Scott, as administratrix and guardian, filed her bill in the circuit court of Albemarle county, setting forth the security debts above mentioned, with other matters concerning the estate, and asking for the sale of a part of the land, that the proceeds might be reinvested in part for her children, and that her dower might be assigned to her. In the proceedings under this bill the widow's dower was assigned to her, and, upon an order of reference to inquire as to the expediency of selling the land for the benefit of the infants, the commissioner returned a report setting forth the debts above mentioned, which had been matured to judgments. This report was in 1870, March 9th, and the said judgments were recovered at the October term, 1869, of the circuit court of Albemarle county. At the August rules, 1871, the said administratrix and guardian filed her first amended bill, asking for a sale of all the real estate and for a settlement of her administration accounts. Under this amended bill all of the real estate was sold on the 28th of May, 1872, to one W. E. Benger for $33,800; $9,000 was paid in cash, and the residue of the purchase money was upon a credit. By petition the widow asked to have her dower commuted, which was done, the creditors consenting, and by decree in the cause the sale was confirmed, and $5,000 of the cash payment decreed to the creditors and $3,500 decreed to the widow in part of her commuted dower right, the whole being ascertained as $8,292 08, which sums were paid accordingly.

Subsequently the purchaser, W. E. Benger, defaulted, after paying interest on the debt to some extent, and a resale was ordered at the February term, 1876, and the special commissioner making this sale reported that the widow had purchased

the land at $17,000, on behalf of herself and her children. This sale the court declined to confirm, for defects in the formal proceedings, and upon a resale the widow again became the purchaser, and at the May term, 1876, she filed her bill in her own right, and as guardian, asking the court to confirm it. The children answered, and the creditors, the appellees here, filed their petition, claiming a recognition of their rights. The court, by decree at this term, confirmed the sale, the property to stand as to the estate as it did before the sale to Benger; and providing further, in the decree, that if the debts due the appellees were not paid within a specified time, then the land should be resold by commissioners appointed for the purpose. Subsequently, at the June term, 1880, the terms of resale were modified so as to require one-fourth in cash and the residue on a credit. In February, 1881, Mary B. and Nannie L. Scott, infant heirs of Charles A. Scott, by their next friend, filed their bill of injunction and petition for rehearing, setting out the former proceedings, and upon various grounds claiming that the creditors were barred and precluded from asserting their demands against the real estate by reason of lapse of time and their *laches* in failing to assert their claims against the personalty, and the administratrix and her surety as being primarily liable for the debts. An injunction was awarded on this bill restraining the sale of the land, and the creditors answered the same, setting forth the *ex parte* accounts taken in 1867; and at the May term, 1881, an account of debts was ordered. At the September rules the heirs filed their amended bill, denying that the *ex parte* accounts were binding upon them, and seeking to surcharge and falsify them as erroneous upon their face. In response to the decree for accounts, the commissioner reported in 1882, showing a balance of $4,830 45 in the hands of the administratrix as of June 1, 1867. Upon exceptions, this report was recommitted, with directions to inquire as to Mrs. Scott's dower and her guardian accounts, and Barksdale, the security of Mrs. Scott, was made a party.

Upon this recommittal the commissioner omitted from his account certain items against Mrs. Scott as to the wheat crop on the farm in 1865, and as to the provisions and stock on hand at the death of her husband, and reduced the balance against her to $2,395 16 as of October 7, 1877. This report was excepted to on both sides, and Barksdale answered, setting up the statute of limitations as to his responsibility as security on the bond of Mrs. Scott. Depositions were taken, showing that in 1879 Barksdale had become insolvent, although before that time he had been solvent and a person of large property.

In August, 1886, the exceptions of the heirs to the commissioner's report were sustained as to the crops of 1865 and the dower, and the report was recommitted. The commissioner corrected his accounts as suggested, and again reported, making the balance against the administratrix $7,844 45 as of October 6, 1877, and the amount of Mrs. Scott's dower $2,065 75, and reported an account of the debts. To this report the creditors excepted, and at the October term, 1887, the commissioner, at the request of the court, filed a special statement, showing the amount due by Mrs. Scott, adding to the former statement a charge for 500 bushels of wheat made in 1865, and to this the Scott heirs excepted, claiming 2,100 bushels of wheat of that year. The court, by its decree at the October term, 1887, overruled said exceptions, and decreed, in accordance with the special statement aforesaid, that the liability of Mrs. Scott, as administratrix, as of October 6, 1887, was $3,637 40, of which $1,649 96 was principal as between her and the heirs, and for this amount the court decreed personally against Mrs. Scott and her security, the same to be apportioned ratably between the creditors. And the court further decreed that the real estate of Charles A. Scott was liable for the debts of the appellees, and ordered a sale thereof to pay the said debts. But it being shown and conceded in the record that P. B. Scott and J. R. Barksdale are insolvent, and that executions upon this decree will be utterly unavailing, the court was of opinion that

the right of the creditors to resort to the real estate of Charles A. Scott should not be unduly postponed; "yet if, by the return of said executions now directed to be issued, it shall appear that any part of their amounts shall be made and secured, then the commissioners hereinafter appointed to make sale of the real estate, shall sell only enough to satisfy the balance of the said debts, if they find it practicable and judicious to sell the same in parcels." The court further considered that the amount of $3,500 paid to Mrs. Scott, as her commuted right of dower, out of the $9,000 paid by Benger in cash, was $1,292 30 in excess of her dower rights in the said sum of $9,000; and that as Benger did not comply with his purchase, and the additional payments made to her for dower in the further payments made by Benger, amounting to $2,138 20 in excess of what she was entitled to receive, and making her debtor to the said heirs on that day of said sum, it would be and is proper now to take the price which said real estate may bring in the resale now ordered, and the age of P. B. Scott, as of this day, as the basis and date for determining the value of her commuted dower in said real estate, or in the proceeds thereof. Thereupon the court adjudged that the value of the widow's dower in the price which the real estate should bring on such resale should be ascertained in the mode therein prescribed, and against said value there should be set off the said sum of $2,138 20, with interest from April 3, 1876; and that if said value shall be less than the said sum of $1,292 30, with interest from June 1, 1872, for which, or to make which good in favor of said heirs, the said creditors are liable, then the said debts of said creditors shall be abated *pro rata* by the amounts of the difference between the said value and the said $1,292 30, with interest as aforesaid. The decree proceeds: " But if said commissioners of sale shall be able to sell a part only of said real estate for a sum sufficient to defray the costs and expenses aforesaid, and to pay the aforesaid debts, then they shall sell only such part." From this decree the Scott

heirs, the appellants, appealed, because the court decreed that the real estate of Charles A. Scott was liable for the debts due the appellees, notwithstanding the circumstances set forth above.

The third section of chapter 127 of the Code of 1873 provides that all real estate of any person who may hereafter die, as to which he may die intestate, shall be assets for the payment of his debts, etc., in the order in which the personal estate is ordered to be applied, and is as follows: "(3) All real estate of any person who may hereafter die, as to which he may die intestate, or which, though he die testate, shall not by his will be charged with or devised subject to the payment of his debts, or which may remain after satisfying the debts with which it may be so charged, or subject to which it may be so devised, shall be assets for the payment of the decedent's debts, and all lawful demands against his estate, in the order in which the personal estate of a decedent is directed to be applied."

The personal property is made by law the primary fund for the payment of debts, and, as was said by Judge Richardson in a late case in this court (*Alexander* v. *Byrd,* 85 Va., 690): "It is true that there should be no distribution, either to the widow or to the other distributees, until the debts are paid, and there can be no resort for their payment to the realty until the personalty has been exhausted. But when that has been exhausted, either by *devastavit* or distribution, the realty in the hands, not of the widow, because she takes and holds her life-estate in one-third thereof by a title which is paramount to the rights of creditors, but of the heirs, must be subjected to the payment of the ancestor's debts. They, and not she, are in possession of something to which the creditors have a better right, and must refund." Citing *Lewis* v. *Overby,* 31 Gratt., 601, and *Ryan* v. *McLeod,* 32 Gratt., 367. The real estate is made assets in the same order as the personal estate, so that while the personalty is first liable, and is therefore pri-

marily to be subjected, both are liable; and it has never been held, and it is not likely ever to be held, that the creditors must take care that the personal representative does not waste any of the assets liable to their debts, or the amount of the waste will be charged to them.    The personal assets are placed in the hands of the personal representative, to be by him administered, and, for the faithful performance of his duties as such representative, bond, with ample security, is required, and the law prescribes how the debts shall be paid; but if the debts are unduly paid out of their order, or the personal assets distributed or wasted, or otherwise exhausted, the law makes the real estate assets, and the same is made liable in the hands of the heirs to the satisfaction of the debts; and by the fifth section of the same chapter the heir who shall sell and convey such real estate after suit brought, is made personally liable for the value of the same, with interest.

It is no answer to the lawful demands of a creditor to plead that there was personal property sufficient to pay the debt, but it has been distributed to the heirs, or has been wasted by the custodian to whom it was by law committed for due administration, who is now insolvent, together with all his bondsmen, and the land held by the heirs is therefore exempt from the debts of the ancestor.    *Davis* v. *Newman*, 2 Rob., 667; *Lewis* v. *Overby*, *supra*.    In the case of *Ryan* v. *McLeod*, 32 Gratt., 375, *supra*, Judge Staples said: "The statute makes all the real estate of the decedent in the hands of his heirs assets for the payment of debts, to be applied in the order in which the personal estate is applied.    As long as any part of it so remains, it is difficult to see how the claim of the creditor can be resisted, unless he has in some way forfeited his right by *laches* or other causes.    There is no injustice in this.    The creditor knows that the personal estate is the primary fund for the payment of debts, and that he has no right to resort to the realty, except in case of deficiency.    He is not acquainted with the condition of the estate, he knows nothing of its assets or

its liabilities. In many cases the necessity of resorting to the realty is not ascertained until years after the death of the decedent. To impose upon the creditor the burden of prosecuting inquiries upon this point, at the peril of losing his recourse against the solvent heirs, is to require of him duties which the statute certainly does not demand. On the other hand, if any one of the heirs apprehends loss by reason of the alienation or insolvency of a co-heir, he can easily take the necessary steps to protect his interests. He can bring a suit to have the estate administered under the supervision of a court of equity, or he may require a proper report of the debts and liabilities to be filed by the personal representative in the proper court, as is required by the statute." Citing ch. 127, secs. 3–5, Code 1873, *supra.*

In this case the alleged *laches* of the creditor is wholly unsustained. The surviving obligor and principal debtor was living for some years after the death of Scott. Four years after Scott's death the creditors brought their suit and recovered judgment at law. Within two years after the death of Scott the first suit was brought (cited above), which was, in effect, a creditors' bill. *Norvell* v. *Little,* 79 Va., 141. In this case, last named, the bill was filed by the widow and heirs of John Little deceased, for settlement and distribution of his estate. The prayer was that the creditors be convened, their debts ascertained and paid, and the surplus distributed. Lewis, P., delivering the opinion of the court, said : " The object of the suit was to convene the creditors, to ascertain and pay the debts of the estate, and to make distribution of the surplus. It was, therefore, substantially a ' creditors' suit,' and time ceased to run against the claims of the creditors certainly upon the entry of a decree for an account." Citing *Harvey's Adm'r* v. *Steptoe's Adm'r,* 17 Gratt., 289; *Bank of the Old Dominion* v. *Allen,* 76 Va., 200. Into this creditors' suit these creditors promptly came and asserted their claims, and at the first sale, made soon after to Benger, they were paid $5,000 out of the

cash payment of $9,000. Five hundred dollars was used in costs, etc., and the widow claimed and received $3,500 in part payment of her dower in the land, which, by mutual agreement and by order of the court, was fixed as above stated. This purchaser finally defaulted in the payment of the purchase money, after paying about $17,000, as above stated. A re-sale was had, and the real estate taken back by the widow and heirs, to belong to the estate of Charles A. Scott, as before. The creditors have never ceased to ask payment of their debts, but it is insisted that they allowed the administratrix to waste the personal property, which consisted of the proceeds in chief of the farm—that is, they waited for their debts during the progress of these efforts to sell the land. It appears that the money coming into the hands of the administratrix was used to support herself and her young children, all little girls, who during this time were growing up to womanhood, were supported, cared for, educated, and some of whom have reached maturity and married. There is evidence in the record tending to show that the proceeds of the farm were necessary for their proper support and education. But the forbearance of the creditors in not pressing more urgently their demands for payment of their debts is now imputed as a fault by the persons who were most benefited by it then, and who still hold and enjoy the property of their father. If these creditors erred in not oppressing this needy and somewhat unprotected family of a widowed mother and her little girls, they erred, it must be admitted, on the side of humanity and charity; and if they had seized, by legal process, these funds needed by the family, they would have doubtless lacked the approval of their own consciences as well as the approval of those whom they would thus have distressed, and the complaint made against them now for this is not maintainable. But in this case the creditors stand upon the high ground of their legal rights. They have asserted their debts in every proper way since the institution of the creditors' suit, the next year after the death

of their debtor, and they are entitled to have payment of their debts out of the real estate of their debtor, which has been decreed to be sold for the purpose of paying them; and there is no error in so much of the decree as so decided.

But the appellees assign error, under rule 9 of this court, as against them, because the court has decreed that the widow's dower was purchased at too high a price by the decree of 1872, and the court has ordered a re-sale and re-estimate of the widow's dower, which if after the re-sale, must appear to be as great as under the first sale, or the deficit must be charged to the creditors, because they consented by counsel to the decree in question. This is clearly erroneous. The sale to Benger was made, and could be made, only on the consent of the widow, whose claim to dower was a vested right—a freehold in the land paramount to the claims of her husband's creditors—equal to one-third of the whole for her life, if not assigned, but which had in this suit been assigned to her. She consented to sell her part of the farm upon a price agreed in the suit, to which the creditors and the heirs were all parties, and the court so decreed. The rights of the parties thus fixed and ascertained ought not to be disturbed now, either on complaint of the heirs or of the widow, and the creditors do not complain. And so much of the decree as re-opens that question, so long settled, brings unnecessary chaos into a cause already fully litigated and too long protracted; and the decree will as to this be corrected, and, as corrected, affirmed, and the cause remanded to execute the decree of sale, if necessary, under its terms—that is, if there is a failure to pay the debts by the administratrix—and for the payment of the debts, and a final settlement of all matters in dispute.

DECREE AMENDED AND AFFIRMED.